PAW PAW SAVINGS BANK *v.* FREE.

1. LANDLORD AND TENANT—FIDUCIARY RELATIONS—TRUSTS.

The action of the president of a bank, while in its active employment, in securing to himself, for his personal advantage, a lease of its place of business where it had been located many years, was a breach of trust, and a palpable violation of his fiduciary relations with the corporation and its stockholders; while he was not technically a trustee, his position was one of trust, demanding the utmost good faith.

2. SAME—LEASE—DELIVERY—SUBSEQUENT LOSS.

Where a lease to the bank of its place of business was properly executed and delivered to defendant, its president, in the interest and for the benefit of the bank by which he was employed, its subsequent destruction or loss would not invalidate it.

3. SAME—ESTOPPEL—EQUITABLE RIGHTS.

Although the directors of the bank, after learning that defendant had taken the lease in his own name, under the advice of the banking department, accepted a sublease from defendant, it was not thereafter precluded from explaining the circumstances of its subtenancy, asserting equitable rights and trying the question of paramount derivative title between it and its president; the general landlord and tenant rule inhibiting the tenant's denial of the landlord's title not being applicable.

Appeal from Van Buren; Tucker, J., presiding. Submitted January 30, 1919. (Docket No. 75.) Decided April 3, 1919.

Bill by the Paw Paw Savings Bank against John W. Free to enjoin an interference with plaintiff's banking quarters, and to construe a lease. From a decree for plaintiff, defendant appeals. Affirmed.

*Glenn E. Warner, David Anderson,* and *Victor M. Gore,* for plaintiff.

See note in 7 L. R. A. (N. S.) 930.

*Alfred J. Mills* and *Thomas J. Cavanaugh,* for defendant.

STEERE, J.   This bill of complaint was filed to restrain defendant, John W. Free, from tearing down, ripping out or removing any portion of a brick wall at the rear of the banking quarters now occupied by the Paw Paw Savings Bank, plaintiff herein, and from ejecting it therefrom, or interfering with its officers in discharge of their duties in the use of the vault and other equipment of said bank on said premises; and that a certain lease thereof dated April 1, 1915, taken by said John W. Free in his own name while plaintiff's president, be decreed to have been obtained for the use and benefit of said bank and to be its lease with the same force and effect as though running directly to it.

Plaintiff, the Paw Paw Savings Bank, was incorporated in 1886, with Frank W. Sellick its president and defendant John W. Free its secretary, and since that time has occupied and used for banking purposes the premises in question, which are located on the first floor of a building owned by George W. Longwell, Sr., and known as the Longwell block, in the village of Paw Paw at the corner of Kalamazoo and Main streets.   For the first seven years the bank had a written lease of these banking quarters from Mr. Longwell; after it expired the bank continued to occupy the same under a verbal lease, continuing to pay a mutually satisfactory rental, $500 per year payable in quarterly installments being paid during the last seven years before the lease in question was given, in which the same rental was specified.

After the death of Mr. Sellick defendant became president, continuing in that position for many years, and until he resigned in December, 1917.   All the original incorporators of the bank had died before

1915 except defendant, and new men became active in its affairs as stockholders and directors. In 1915 dissensions arose and two factions developed between members of the directorate, the occasion and responsibility for which are somewhat in dispute and unimportant in this controversy beyond the fact that they existed and were apparently the moving cause for defendant's conduct of which complaint is made. Defendant and those associated with him held about one-third of the stock of the bank and the opposing faction the remainder. He, however, remained an active officer of the bank and was retained as its president, receiving his regular salary of $2,000 per year, until his resignation took effect on December 31, 1917, after he had matured his plans to open a private bank in the same building, which he did under the name of The John W. Free & Co. Bank, on January 1, 1918.

It is claimed for plaintiff that for some time prior to April 1, 1915, there had been discussion among the directors as to the advisability of securing a written lease from Mr. Longwell of the premises occupied by the bank and that defendant was informally authorized to obtain the same. He about that time interviewed Mr. Longwell upon the subject and secured a lease. Longwell testified that about the first of April, 1915, defendant met him in the office of the store of Longwell Brothers and said, "the directors thought they ought to have a lease, and instructed him to get the lease, terms to that effect. I said it was a proper thing to do, best for all parties, and he said the same conditions, for 5 years"; that after the time and terms had been talked over defendant went away, and supposing it was left for him to attend to he drew up a lease between himself and the Savings Bank, the rent being $500 a year, for a term of five years payable quarterly which he signed and took to the bank, delivering it to Mr. Wolfs, the cashier, and asked him

to hand it to defendant, who was not present. Mr. Wolfs laid the lease aside and on defendant's return told him of it. He testified that Mr. Free picked the lease up and asked him to say nothing about it. This defendant denies. He did, however, interview Mr. Longwell some time later and told him that for personal reasons he would like to have the lease run to himself. Of this Longwell testified:

"He (Free) came in the office, same place where he met me before, and says: 'Now, in regard to the lease business, I would like to have it changed to myself, or John W. Free, and if you just as soon, for particular reasons of my own,' and I says: 'Why, of course. It is no affair of mine. I just as soon make a lease to you, John, as the savings bank. You are a responsible man. You have done business with me all these years, and I would as soon make it out to you, anyway, if that is your wish.' And he said: 'I will have Lynn draw up a typewritten lease.' 'Well,' I said, 'all right, if that makes it any stronger,' and he did make a typewritten lease which I signed in duplicate and Mr. Free signed."

This lease, which is dated April 1, 1915, covered the quarters which plaintiff had occupied and used for the transaction of its banking business since its organization.

Wolfs became cashier of the bank in 1910, terminating his connection with it by resignation in November, 1917, shortly before defendant resigned. At the time of the events giving rise to this controversy they were the salaried executive officers in direct charge of the affairs of the bank. To what extent Wolfs was personally interested beyond his employment does not appear, but it is undisputed that as friction developed between the so-called Free and Allen factions of directors he was allied with the latter which represented the controlling interest. It was denied for defendant during the trial that any lease was ever

obtained for the bank by him and considerable testimony was devoted to that issue. Wolfs testified that the advisability of securing one had at different times been discussed amongst.the directors and between himself and defendant who on one occasion suggested a written lease should be obtained to prevent further increase in rent, which had previously been imposed, and after the lease was brought into the bank by Mr. Longwell as related he (Wolfs) examined it; that it was a five-year lease of the premises running from Longwell to the bank, at a rental of $500 per year payable quarterly; that when at a. subsequent meeting of the directors the affairs of the bank were being discussed he told them of it and Mr. Free stated no such lease had been taken by him; and learning later that Free had a lease of the property in his own name Wolfs so advised the directors. Free testified of this that after he obtained the lease to himself he told the directors of it and they made no complaint until Wolfs told the board that the lease did not run to defendant but to the bank, which greatly surprised him, and he stated to the board it was not true, "because up to that time I never knew but that it did run to me." While not admitting that a lease was made to the bank by Longwell, as Longwell and Wolfs both positively testify, he conceded that Wolfs turned over to him in the bank a lease Longwell had left there for him, which did not suit him because it was crudely drawn, required security for the rent, he wanted two copies and wanted them typewritten, finally saying:

"Anyway, I didn't want it that way, so I told him (Longwell) I was not satisfied with it and I would have my son draw a typewritten lease for himself to have and one for me to have, which he did."

He also stated, in direct contradiction of Longwell's testimony, that he never asked him for a lease to the bank, but to himself, "for personal reasons" and that

when he obtained the second he returned the first lease to Longwell, which the latter denied.

Of his attitude in relation to obtaining this lease to himself defendant testified on cross-examination:

"I have stated that my reasons for doing that was that such a lease would serve my personal interest and that is correct. I got the lease for that purpose and I was president of the Paw Paw Savings Bank, and my personal interests were antagonistic to those of the bank at that time and that is the reason I took this lease. I had not resigned as president at that time. * * * It was absolutely for personal reasons that I took this lease. At the time I served notice on the Paw Paw Savings Bank to vacate the premises, I was still the president and director of the bank. As president, I had not made arrangements for other quarters for the bank. I had not personally done anything to prepare other quarters for this bank that I notified to vacate. I had not directed anybody to do that."

While some complaint was voiced by certain of the directors to the defendant taking the lease in his name, he was president of the bank, the chief officer in direct charge of its daily affairs and at that time intimated no purpose hostile to its interest or intent to evict the bank from the quarters it had occupied for near 30 years, and it continued in occupation as before, paying the same rent. He had previously looked after paying its rent and no change took place in that respect, except that he credited the payments to himself on the books of the bank and personally paid the rent to the owner of the building.

The charter of the bank would expire in 1916 and on May 28, 1915, a resolution was adopted relative to extending, or renewing, the same. In the latter part of that year and continuing during 1916 the bank was in correspondence with the banking department of the State upon the subject, in which the affairs of the bank were discussed. The department became ad-

vised of the lack of harmony amongst directors of the
bank, including the matter of this lease, and strongly
intimated those differences should be adjusted before
a renewal of the charter would be favorably consid-
ered.   On October 28, 1915, the banking commission
wrote the bank, in part:

"8th. The department cannot at this time consent
to the extension of corporate existence in view of the
above mentioned assets and in view of certain other
internal conditions about which the department should
have more information.   I believe a thorough under-
standing cannot be had in any other way than to have
your entire board of directors and active officers visit
the department at some day in the near future."

And on April 6, 1916:

"21st. Referring to the department's letter of De-
cember 9th, we notice that the same condition obtains
with reference to the lease of your bank building as
at previous examinations.   As stated in that communi-
cation, the writer is of the opinion that the department
will insist that some arrangement be made whereby
a suitable banking office is assured before charter ex-
tension is granted.   This is one of the matters that
should be worked out by officers and directors, and
the department must be advised as to what course
will be pursued with reference to the lease of the bank
building."

"23d. We trust that the department may receive
within the next twenty days at the very latest, advice
as to elimination of the assets mentioned in this letter,
as well as information relating to the reconciliation of
the factions on your directorate and advice as to the
lease of the bank building."

The records of the bank show that on April 18,
1916, the matter of the lease was taken up at a meet-
ing of the board of directors and defendant informed
the board it was his intention to hold the lease per-
sonally, after which a committee was appointed to
secure other quarters for the bank if possible.   Noth-
ing seems to have resulted from this and early in May,

1916, A. E. Manning, the State deputy commissioner of banking, visited Paw Paw to confer with the directors in an endeavor "to straighten out the difficulties that existed in the bank." He testified that he was very frank with the directors and "told them we would expect the bank would secure a permanent home, or a home for a sufficient length of time to warrant us in extending the charter. * * * As to straightening out the complications that had arisen out of the lease, after considerable discussion it simmered down to a question of buy or sell proposition"; that following an intermission for supper the Frees agreed to sell for a certain price which the others accepted, and an agreement was drawn up accordingly in which the lease of these premises was to go to the bank. It had some time before been called to Manning's attention that there were several loans in the bank which had become assets on the say so of A. L. Free, defendant's son, and when they came back with the agreement he asked A. L. Free whether, if they sold, he would pay a loan which he owed the bank, and he replied he would not. Manning then said that so far as the department was concerned it would expect him to pay his indebtedness to the bank if he sold his stock, which he refused to do and the agreement was not consummated. It is said in defendant's brief: "This was a gratuitous insult to that gentleman, which both he and his father resented"; and it was largely because of this the agreement failed. Following this Manning had an interview with defendant and his son and suggested that defendant give the bank a sublease of the premises which he at first declined to do, but in an interview with Manning the next morning "agreed to sub-let the bank quarters to the bank," as Manning stated it, but as defendant testified, "until the following December." Manning then informed the others and returned to Lansing. At

a special meeting of the directors, on May 5, 1916, a resolution was adopted, with recitals, concluding as follows:

"Whereas, J. W. Free has a lease of said premises, running from George W. Longwell, Sr., owner of said premises, to the said J. W. Free, and

"Whereas, the said J. W. Free has consented to sublet and lease said premises to the said Paw Paw Savings Bank,

"Now, therefore, be it resolved by the said Paw Paw Savings Bank by its board of directors that said bank, through its board of directors do hereby accept of said J. W. Free said sublease, according to terms of said sublease; and be it further

"Resolved, that C. A. Wolfs, cashier of said bank, be and he is hereby authorized to sign and accept said lease for the use and benefit of said bank."

The sublease, dated May 5, 1916, which defendant proffered was "for a period ending December 1, 1916, at six o'clock in the afternoon." The charter of the bank was thereafter renewed and its business continued as before in its old banking quarters without any special disturbing incident so far as shown until, on November 14, 1917, defendant, while yet its president and in its employ, served notice upon the bank to surrender possession of its quarters on or before January 1, 1918. On December 14, 1917, he had rented of Longwell rooms in the building directly adjoining that portion occupied by the bank, and employed a contractor to tear out the partition wall between, which he was proceeding to do when this bill was filed by the bank, on December 21, 1917, and a preliminary injunction obtained.

Defendant duly answered, the case was heard upon testimony taken in open court and the relief asked by plaintiff was granted.

It scarcely requires argument or citation of authorities to show that the scheme of defendant to under-

mine this bank, of which he not only was a director and president but its hired agent in active employment, by securing to himself for his personal advantage a lease of its place of business where it had been located for many years was a breach of trust, and a palpable violation of his fiduciary relations with the corporation and its stockholders. Any differences existing between him and certain of the directors afforded him no immunity from his responsibilities, and duty as a director and president of the bank to do all things reasonably within his power to promote its business and enhance its profits. The trial court rightly said that his effort while president—

"to seize by an apparently legal but actually unlawful and inexcusable means the quarters occupied by the bank at a time when its charter had expired and such action was liable to prevent its renewal. was quite likely to injure seriously the usefulness of the bank."

Defendant saw fit to retain his position of trust as director and salaried president of this bank and was held by such position to faithful service in its behalf during a time when he admits his "personal interests were antagonistic to those of the bank," and says he took the lease for "absolutely personal reasons; * * * to protect myself against being imposed upon by others." While not technically a trustee his position was one of trust demanding the utmost good faith. While many authorities might be cited to that effect the recognized duties of one in his position are sufficiently and clearly summed up by Justice Field in *Wardell* v. *Railroad Co.*, 103 U. S. 651, as follows:

"It is among the rudiments of the law that the same person cannot act for himself and at the same time, with respect to the same matter, as the agent of another whose interests are conflicting. * * * The law, therefore, will always condemn the transactions of a party on his own behalf when, in respect to the matter concerned, he is the agent of others, and will

relieve against them whenever their enforcement is seasonably resisted. Directors of corporations, and all persons who stand in a fiduciary relation to other parties, and are clothed with power to act for them, are subject to this rule; they are not permitted to occupy a position which will conflict with the interest of parties they represent and are bound to protect."

It is further contended for defendant that assuming but not conceding the lease taken by defendant to himself could have been held as taken for the use and benefit of the bank had it seasonably so insisted by proper legal proceedings and not accepted defendant as its landlord, it must be held as now conclusively estopped by its subsequent delay, acquiescence and acceptance of a sublease from defendant, particularly appealing with citation of authorities to the well-recognized general rule that a tenant in possession of leased premises may not dispute his landlord's title.

On the claims of delay and acquiescence the fact is to be kept in mind that defendant as its president was not only at the head of and the representative of this corporation but actively employed by it as a salaried officer behind the counter ostensibly attending to the details of its daily business, whose duty it naturally was to look after such matters as this in the interest of his employer, rather than the unemployed directors engaged in other pursuits and not in constant touch with its current affairs. He is not in a position to take advantage of neglect and delays in the affairs of the bank for which he is in any manner responsible.

In the first place, we think it conclusively shown that Mr. Longwell, the owner of the building, gave a new lease of these premises to this bank which had occupied them as his tenant for more than a quarter of a century, at the request of its president, and delivered the same at its place of business into the hands of its cashier, with the natural request that he hand

it to the bank's president, with whom Longwell had transacted the business. This the cashier did. So far as Longwell was concerned he had executed and delivered to the bank a five-year lease, which he testified was never returned. Its destruction or loss would not invalidate it after it was executed and delivered. It was secured by and delivered to defendant in the interest and for the benefit of the bank by which he was employed, and was a transaction in the line of defendant's official duty, while securing a second lease for and to himself was not, but a violation of it, and an act hostile to the interest of the bank.

But beginning the inquiry with this second lease running to defendant, it is the general rule that:

"Though a tenant may not have any absolute right to a renewal against the will of his lessor, courts of equity recognize his reasonable expectancy of renewal as a property or asset, and if one standing in a fiduciary or quasi-fiduciary relation to a lessee secures a renewal of the lease to himself, a court of equity will treat him as holding the lease in trust for the original lessee;   *   *   *

"Where an agent of a lessee employed in reference to demised premises secures a lease to himself from the lessor on the expiration of the lessee's term, the lessee is entitled to the benefit thereof."   18 Am. & Eng. Enc. Law (2d Ed.), p. 696.

Thereafter the bank remained in its old quarters continuing its business there and paying the same rent as before, the money, or its equivalent, to pay rent being taken from the bank's funds by its president and paid to the same landlord, with no physical change in any respect so far as shown, except in defendant's bookkeeping. Although some complaint was made when the other directors learned that he had the lease run to himself, he was yet retained as salaried president in the same position of trust as before, expected and in duty bound to attend to the affairs

of the bank and guard its interests, not least of which was assured quarters at its old business stand. This he continued to do, seemingly in the same manner as for many years before the period under consideration, and until it became necessary for the bank in continuation of its business to renew its charter which was about to expire, and the State banking department required that before doing so it should, amongst other things, adjust the matter of this lease, which the department had learned was an uncertain and disturbing element in its affairs. At this critical period in the career of the bank defendant's refusal to co-operate and claims as to his lease of its quarters seriously embarrassed and delayed securing an extension of its corporate life by renewal of its charter until, on suggestion of the deputy bank commissioner, the matter was temporarily adjusted by this sublease, acceptance of which defendant now seeks to interpose as an estoppel under the general landlord and tenant rule inhibiting the tenant's denial of the landlord's title.

The general rule is not to be questioned where the facts are such that it applies, but here plaintiff did not enter under a lease from defendant. Neither of these parties makes any claim to the premises beyond a bare tenancy. Longwell is the primary landlord and owner. The bank was let into possession by him and had enjoyed the same for many years as his tenant before these leases in question were given. At the request of its president, to whom he answered that it was a proper thing and best for all parties, as he testified, Longwell gave to his old tenant a new lease for five years at the same rental it had been paying for many years before; and when its president later asked that it be made to himself he assented without return of the first, as he states, and signed another which defendant had prepared, saying it was no affair of his and he had just as soon make a lease to defendant

as to the bank. The bank thereafter continued in possession, in the same business, with the same officers in charge, it paying and he receiving, from its president, the same rent as before. There never was any actual delivery of possession by defendant to the bank, or direction to the bank from the owner of the premises to attorn to defendant who in fact paid nothing and parted with nothing in the transaction, the only change being in crediting and charging to himself the money he took out of the bank to pay the rent. At the time he sought to evict plaintiff and get possession of its place of business in which to start a private bank he was yet plaintiff's president and the sublease had long since expired. To apply the doctrine of estoppel under such circumstances would enable him to secure an unfair advantage by a breach of trust and consummate a wrong to the corporation with which he was then in fiduciary relations as director and president.

The rule invoked by defendant does not preclude plaintiff from explaining the circumstances of its expired subtenancy, asserting equitable rights and trying the question of paramount derivative title between it and its president.

"The tenant or his assignee, it may then be broadly stated, is not estopped to explain the circumstances under which, being already in possession, he has made acknowledgment of an attornment to the plaintiff." Bigelow on Estoppel (6th Ed.), p. 568.

In the case of *De Peralta* v. *Ginochio*, 47 Cal. 459, where defendant was not let into possession by plaintiff, whom he had recognized as landlord, and was permitted to assert but failed to show a paramount title, the court said:

"It appears that the defendant was in possession of the premises at the time when the verbal lease was

made, and he relies upon the rule in *Tewksbury* v. *Magraff*, 33 Cal. 237; *Franklin* v. *Merida*, 35 Cal. 566, and other cases in this court, to the effect that as he did not enter under the lease from the plaintiff, but was in possession at the time it was made, he is not estopped from disputing his landlord's title. The rule, in its operation, permits the tenant in such case to dispute his landlord's title, by showing that his is the better title. It is not enough to dispute it by averment, but proof is required on his part. The landlord, by the production of the lease, makes a *prima facie* case, and the burden of proof is cast on the tenant; and unless he overcomes it by showing paramount title in himself, or those under whom he claims, the landlord must prevail."

A conflict of authority exists in other jurisdictions in cases where the question of estoppel arises solely out of prior possession and later acceptance of lease by the same person, which is carefully considered in *Franklin* v. *Merida, supra,* but this inquiry goes further, presenting other questions involving equitable claims. We think the circumstances of this case fairly relieve it from the general rule of estoppel from questioning the landlord's title under the principles stated in *Fuller* v. *Sweet,* 30 Mich. 237 (cited with approval in *Lake Shore, etc., R. Co.* v.   *hnson,* 157 Mich. 115), wherein it is said, in part:

"And it was held in *Accidental Death Insurance Co.* v. *Mackenzie,* 10 C. B., N. S. 870, that a party might set up his own title at the expiration of his term, without restoring possession, upon the plain and sensible ground that it would be idle to compel a party to go out of possession, when he could turn round and recover it back upon the title, and hold the person to whom he had restored it as a wrongful occupant.   *   *   *   Where there is possession given, there is an actual consideration, which may render it also reasonable enough, under ordinary circumstances, to require the landlord to be put back in *statu quo.* But a person who never had or gave up possession to the tenant, is left *in statu quo* by the tenant's remaining

in possession, and in reason should have no further claim."

The decree will stand affirmed, with costs to plaintiff.

BIRD, C. J., and OSTRANDER, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.