[No. 29140. Department Two. August 11, 1944.]

R. J. RAYMOND, *as Trustee and Assignee, et al., Respondents*, v. E. F. MACFADDEN *et al., Defendants*, E. F. MACFADDEN, *Appellant*.[1]

[1]Reported in 150 P. (2d) 829.

*Burcham & Blair* and *E. Ben Johnson,* for appellant.

*Weaver & Weaver* and *Hamblen, Gilbert & Brooke,* for respondents.

ROBINSON, J.—This action was brought by respondents Raymond and The Old National Bank of Spokane to impress a trust upon a lease held by MacFadden to certain property situated in Spokane, and to enjoin him from disturbing Raymond's occupancy thereof. MacFadden countered with an action for unlawful detainer. The closeness of the principal question involved requires as clear a preliminary outline of the facts as their complexity will permit.

Schuler and Inman owned a two-story building in Spokane, in which they carried on a business of bottling and distributing soft drinks. On the first floor, there were heavy, special machinery, the office, storage room, and loading facilities, and on the second, eight living apartments. In 1937, they leased the building to John L. Rinehart and wife, giving them, first, a two-year, and, later, a three-year term. The Rineharts carried on the business under the name of "Rinehart Beverages." The second lease stipulated a rental of two hundred fifty dollars per month, but, by oral arrangement, the actual rental paid was two hundred dollars monthly. The expiration date of that lease, and this is a fact of great importance, was December 31, 1941. After that date, the Rineharts held under a month to month tenancy.

Early in 1942, the events out of which this action arose began to occur with great rapidity, some of them coincidentally. On February 13th, the Rineharts gave MacFadden an option to purchase the business. On the same day, they made an assignment to respondent Raymond, an assistant vice-president of a Spokane bank, for the benefit of creditors. On the same day, Raymond employed MacFadden to manage the business. The letter confirming the employment, dated February 13th, reads as follows:

"This letter will evidence the agreement by which I, as trustee for the benefit of creditors of Rinehart Beverages,

employ you as manager of the business. Your employment will commence Friday, February 13, 1942, and will continue for such period of time as shall be mutually agreeable. This contract can be terminated by either party at any time by giving thirty days written notice preceding the date of termination. You shall be entitled to compensation for your services at the rate of $250 per month, beginning this day."

Five days after they granted the option to MacFadden to purchase the business and made the assignment to Raymond for the benefit of creditors, both Rinehart and his wife were found dead in their apartments.

On March 5th, MacFadden took, in his own name, a lease of the premises from Schuler and Mrs. Inman, the executrix of her late husband's estate. The stipulated rental was two hundred dollars per month, the same as was then payable and being paid by Raymond under his month to month tenancy.

On March 13th, the other respondent, The Old National Bank of Spokane, was appointed administrator of the consolidated estates of Rinehart and wife. On a date not known, but which, according to the findings of the trial court, must have been about July 25th, Raymond gave MacFadden a thirty-day notice of discharge. On August 1st, Raymond and the bank, acting jointly, notified Mac-Fadden that they did not recognize the validity of his option to purchase the business. On August 24th, MacFadden's employment as manager terminated, and shortly thereafter he negotiated a new lease with Schuler and the Inman estate, for a term of two years from September 1st at two hundred dollars per month. He also took an assignment from Schuler and Mrs. Inman which, omitting the formal parts, reads as follows:

"WITNESSETH: That in consideration of a lease for the term of two years from this date executed by said First Parties as Lessors to said Second Party as Lessee, of the following described premises, to-wit: [Here follows description of the property] said First Parties do hereby assign and transfer unto said Second Party all the rights and interest of the First Parties in and under the present ten-

ancy and occupancy of said premises by R. J. Raymond, Assignee, from month to month at a rental of Two Hundred Dollars ($200.00) per month, payable monthly in advance, including in this Assignment and transfer the rent for the month of September, 1942, with the right to collect all rents arising from said tenancy and to terminate the same in the manner provided by law, and re-enter and receive possession of said premises, as fully as the said First Parties might or could have done, except for this Assignment and transfer, and the said Second Party accepts the foregoing Assignment as and for the possession of said premises granted him by said lease."

On September 4th, MacFadden sent Raymond the following letter:

"Herewith I hand you duplicate Assignment by Fred Shuler [Schuler] and Esther V. Inman to me of their interest in your tenancy of building, occupied by you as assignee, and carrying September rent, which is now past due. This is a demand upon you for that September 1942 rent in the sum of $200.00, less $54.78 which had been paid to me by Anderson and Zurbrugg, two of the apartment tenants.

"It is my intention to withdraw from your tenancy the second story of the building and rent to you only the ground floor, after this month. It will be necessary for us to make arrangements about the amount of your rent after this month, and to do so on or before next Tuesday, September 8th."

On September 9th, MacFadden served the plaintiffs with notice to quit the premises on September 30th. This action was begun immediately. The theory upon which it was brought may be best indicated by quoting an excerpt from the complaint. Speaking of the first MacFadden lease, that of March 5, 1942, the plaintiffs allege, in paragraph seven of their complaint:

"That thereafter plaintiff trustee adopted, ratified and confirmed said lease, by remaining in said premises and by paying the rental reserved therein, according to its terms, and plaintiff trustee does hereby ratify, adopt and confirm said lease as his own."

It was thereafter alleged that, since that lease was in good standing, Schuler and Inman had no right and

power to cancel it and execute said lease of September 1st, and that they acted wrongfully in so doing. The principal relief sought was a decree declaring that MacFadden held the March 5th lease as a trustee for Raymond, and that it was a good, valid, and subsisting lease between Raymond and the owners of the premises; that MacFadden and the owners be restrained from interfering with his occupancy thereof; and that the proposed lease of September 1st be held wholly inoperative as to plaintiffs. Issues were made up as between all the parties, and MacFadden was permited to file a cross-complaint in unlawful detainer. However, at the beginning of the trial, counsel for Schuler and Inman announced that their clients would take no adversary part therein, but would recognize that Raymond held under the March 5th lease, or that MacFadden held under the September 1st lease, as the court might decide.

The trial court, after analyzing the matter at length in a carefully prepared memorandum opinion, entered a decree giving the plaintiffs even more than they had prayed for, in that it held that MacFadden held both leases as a trustee for Raymond, provided that MacFadden should have the benefit of both to the extent that his option might be enforcible. It was further ordered, adjudged, and decreed that Raymond was entitled to occupancy under both leases, and the defendants were restrained from interfering therewith so long as plaintiff Raymond or his successors in interest comply with it. It was further ordered that MacFadden's cross-complaint be dismissed, and that the plaintiffs have judgment for costs.

The trial judge begins his memorandum decision by quoting the following from 2 Am. Jur. 203, § 252:

"The agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto. His duty is to act solely for the benefit of the principal in all matters connected with his agency."

The respondents' theory, that the lease or leases belong

to Raymond, is indicated by the quotation from 3 C. J. S. 13, § 140:

"An agent found guilty of a breach of duty in this respect will be regarded as holding his newly-acquired interests as trustee for the principal, since all rights, title, or interest inure to the benefit of the principal, and the agent may be compelled to transfer them to the latter, . . ."

Both the court's memorandum and the respondents' brief cite a number of our own cases in support of these general rules. The first of these, in both instances, is: *Ackerson v. Elliott,* 97 Wash. 31, 165 Pac. 899, wherein an agent secretly purchased the property of his principal and resold it at a profit. The second is: *Perkins v. Perkins,* 151 Wash. 252, 275 Pac. 541, which holds that, where a nonresident principal assigns a second mortgage to an agent for the purpose of foreclosing to cut off subsequent lien claims, the agent cannot profit by buying up the lien claims and bidding in the property at the foreclosure sale. The third is: *McRae v. Farmers State Bank,* 178 Wash. 642, 35 P. (2d) 58, which holds that a bank, as a general agent for collecting liens for the plaintiff, cannot make collections from their common debtor and apply the payments to its own debt, to the detriment and loss of the principal.

Others of our own cases are cited, and many cases from other jurisdictions, many of which involve the taking of leases by an agent or employee. Among these are: *Steinberg v. Steinberg,* 123 Misc. 764, 206 N. Y. Supp. 134; *Davis v. Hamlin,* 108 Ill. 39, 48 Am. Rep. 541; *Gower v. Andrew,* 59 Cal. 119, 43 Am. Rep. 242; *Schwartz Amusement Co. v. I. O. O. F.,* 278 Ky. 563, 128 S. W. (2d) 965; *Essex Trust Co. v. Enwright,* 214 Mass. 507, 102 N. E. 441, 47 L. R. A. (N. S.) 567; *H. C. Girard Co. v. Lamoureux,* 227 Mass. 277, 116 N. E. 572; *Paw Paw Sav. Bank v. Free,* 205 Mich. 52, 171 N. W. 464. The first and last of this list of cases are particularly relied upon. The *Steinberg* case holds that a lessor's reasonable expectation of renewal is a property right. The *Paw Paw* case holds that, in equity at least, such an expectation is regarded as an asset, and that, when a president of

a bank took a lease of its premises in his own name, after its former lease had expired and while the bank was in occupancy under a month to month tenancy, he held it as trustee for the bank.

It would seem, as a matter of first impression, that the familiar rule invoked and the authorities cited to illustrate its application would warrant the affirmance of the decree of the lower court; but the matter is not so simple as that. The appellant does not question the general rule or the soundness of the authorities cited, but vigorously contends that, when certain particular facts of this case are carefully analyzed, it becomes apparent that the rule is not applicable. Whether or not this is so is the principal, and, indeed, the only, question for our determination. Unfortunately, from the standpoint of brevity, it is one that cannot be satisfactorily disposed of by general statements. A more detailed statement of the facts is indispensable.

For some months prior to the day the Rineharts assigned to Raymond and gave the option to MacFadden and Raymond employed MacFadden, MacFadden had been attempting to acquire Rinehart Beverages. He actively participated with the Rineharts and Raymond in the many conferences leading up to the consummation of the three agreements arrived at on February 13th. The assignment made by the Rineharts to Raymond and the option given by them to MacFadden on that day were interdependent, each expressly referring to the other. The principal reference by the assignment to the option reads as follows:

"7. After the expenses of administration as herein contemplated have been paid and all creditors of the debtors have been paid in full, the surplus, if any, and the property then remaining in the trust estate, if any, shall be returned to the debtors or to such persons as they may designate; *provided, however, that the Trustee shall recognize an option agreement dated the 13th day of February, 1942, between the debtors herein named and E. F. MacFadden providing for the sale by said debtors to the said MacFadden of the said debtors' interest in the said property upon certain terms and conditions therein provided and shall convey the residue of the trust property in accordance with the said option should the same be exercised.*" (Italics ours.)

Clearly, this is a promise by Raymond for the benefit of MacFadden, and, moreover, the promise is one of the considerations which Raymond gave to the Rineharts for the assignment. It is also clear that the transactions of that day created in MacFadden what may loosely be described as a kind of contingent, residual interest in the business. The appellant contends that his employment by Raymond did not make him a mere agent, but that his was an agency coupled with an interest, at least a contingent and inchoate interest.

Raymond, as trustee for creditors, took over the business, and his manager, MacFadden, operated it under his general supervision. The Rineharts' lease had expired. Late in February, MacFadden paid that month's rent, sending Schuler a check for two hundred dollars, signed "Rinehart Beverages, R. J. Raymond, Trustee, by E. F. MacFadden, Mgr." At about that time, MacFadden, who had known the expiration date of the lease long before the February 13th agreement was entered into, went to Raymond and pointed out that the business might be ruined if the owners should suddenly give notice to vacate or should sell the building. He proposed that a lease be secured from the owners. In their oral evidence, the parties differ as to what was said at this conversation, but not more than might reasonably be expected when two adversaries are called upon to recall the details of a conversation had some months before. Raymond says that MacFadden first proposed that he (MacFadden) take a lease in his own name, and that he told them he did not want him to do that, whereupon MacFadden urged him, as trustee, to take a lease. MacFadden says that he first urged Raymond, as trustee, to take a lease, pointing out that, without a lease, they might be compelled to move to a new location at the very peak of a seasonal business, and that, upon Raymond's refusal to become obligated on a lease, he then suggested that he take a lease in his own name, urging that it would serve to protect Raymond's interest as well as his own. He admits that Raymond said he did not wish him to do so, but denies

that he agreed that he would not. There are other slight differences in the evidence of the principal actors which we deem of little importance, in view of the fact that they, later, formally stated their respective positions concerning the lease in writings which are in the record.

On March 5th, as previously stated, MacFadden took a two-year lease from Schuler and Inman, the rental stipulated being two hundred dollars per month. Within a day or two, Raymond heard of this and called MacFadden in to discuss the matter on March 9th. Again, their oral testimony as to what was said is not altogether in accord. We may reasonably assume that each carefully made the best case for himself that he could in the exchange of letters which immediately followed. On March 10th, MacFadden wrote the following letter to Raymond:

"Dear Mr. Raymond:

"Referring to the lease dated March 5, 1942, by and between Fred Schuler and the Estate of Omar M. Inman (executed by Esther V. Inman, individually and as Executrix of the Estate of Omar M. Inman), leasing to me for the term of two years from the first day of April, 1942, to the 31st day of March, 1944, the following described property:

[Here follows a legal description of the property.]

I want you to be informed that I have taken this lease for the purpose of insuring uninterrupted occupancy of this property by Rinehart Beverages, which occupancy has for some months been endangered, due to an expired lease and the owner's urgent desire to sell the property. The owner's real estate agents have recently shown the property to several prospective buyers, and I understand has also had some prospects to lease same, and I considered it beneficial to the interests of all creditors that the business have protection from the various contingencies that might arise.

"The existence of my lease will, therefore, serve as a protection of, and for the working out of, the 'ASSIGNMENT FOR THE BENEFIT OF CREDITORS,' dated February 13, 1942, executed by John L. Rinehart and Helen R. Rinehart, his wife, to yourself as Trustee, and is not intended in any way or in any degree to be hostile to your interests as Trustee, or to the creditors of the foregoing individuals, while at the same time affording protection to myself under the option which has been granted to me by John L. Rine-

hart and Helen R. Rinehart for the purchase of the Rinehart Beverage business as now conducted.

"Very truly yours,

"E. F. MacFadden"

To the foregoing letter, Raymond replied on March 24th, as follows:

"Dear Mr. MacFadden:

"This will acknowledge receipt of your letter of March 10 relative to the lease you have taken on the building occupied by the Rinehart Beverages. In order to keep the record clear in this matter, I think it well that I set forth in this letter my understanding of the situation, and record the conversation we had before the lease was taken.

"When you broached the subject to me, you stated that the building was for sale, that several prospective buyers or their agents had been inspecting the property, that Mr. Schuler was considering selling the property and was pressing you to take a lease and an option to buy. Your statement was to the effect that Mr. Schuler's experience with the Rineharts was not satisfactory and for that reason he did not want to do business with young Rinehart but preferred to do business with you. You thought it advisable that a lease be taken, either in your name or in mine as Trustee, for the protection of the business, as you were apprehensive lest the building be sold and the Rinehart Beverages forced to move. You recollect that I discounted the possibility of sale and said that I, as Trustee, would take my chances on being forced out of the building, that I saw no necessity for taking a lease at this time, and asked you not to do so and that, if further pressed, you continue to put Mr. Schuler off.

"When you left that morning it was agreed between us that nothing would be done about a lease. I was surprised to learn later that a lease had been taken in your name. What complications this may cause, I am not prepared to say, but I felt then and feel now that it was not the thing to do.

"What I specifically want you to understand is that the lease was not taken for the protection of the business, the Trustee or the creditors, as I told you that, as representative of the creditors, I would take my chances. Whatever your reason may have been, it could not have been for that purpose. Sincerely,

"R. J. Raymond

"Assistant Vice President"

It will be remembered that this action was brought on the theory that Raymond adopted the March 5th lease "by remaining upon the premises and paying the rental due," etc. While we do not agree with appellant's contention that the last paragraph of Raymond's letter, above quoted, is an outright rejection of the lease, it certainly does not indicate any intention of adopting it, nor have we been able to find anything in the record which tends to support the allegation of the complaint that he adopted it, except the following:

Mr. Raymond was asked by his counsel: "Q. Now, Mr. Raymond, did you adopt and have you adopted this lease as your own?" Objection was made that this called for the very conclusion that it was the function of the court to make, and it was urged that the witness should be restricted to testifying as to his acts, if any, indicating that he had adopted the lease.

"THE COURT: I think I will permit it as expressing his intention and I will consider it in that light only and disregard what would ordinarily be a conclusion as to his construction of what his acts and conduct may have resulted in. I will disregard that as a conclusion. I will permit the question, however."

The witness answered: "Yes." The respondents thereupon introduced certain rental checks, and it is argued here that these tend to prove the adoption of the lease. But we do not follow that argument. The checks for February and March were given before the lease was made and while Raymond unquestionably held under a month to month tenancy. The checks given for April, May, June, July, and August rent are, except as to dates, identical in every respect with the checks given for the February and March rent. All are signed, "Rinehart Beverages, R. J. Raymond, Trustee, by E. F. MacFadden, Mgr." They, therefore, do not in any way indicate that Raymond adopted the lease or assumed any liability thereon. There is no evidence of any act on his part, of any kind or character, indicating that he adopted the lease, or any evidence whatever that he ever in any way claimed the benefit of it until

he brought this action. On the other hand, it is clear that throughout he was determined not to become liable on a lease of the premises. As he said in his letter, he was willing to take his chance of being forced out of the building, and, even in bringing this action, he sought to become a lessee as to the first lease only, praying, as to the second, that it be decreed "inoperative as to plaintiffs."

The check exhibits, however, strongly indicate that Mac-Fadden acted in good faith in taking the 5th of March lease, for the reasons set out in the last two paragraphs of his March 10th letter to Raymond. In that letter (above quoted in full), MacFadden assured Raymond that he took the lease for the protection of his own interest, and that he had no intention of using it in hostility to him, and his subsequent acts are wholly consistent with that assurance, for he continued to pay the monthly rental with trustee Raymond's checks, in the same manner as he would have done had the lease never been made. We find nothing in the record which indicates that, if, during the period from March 1st to late August, the landlord had given notice of termination of Raymond's month to month tenancy, MacFadden would not have attempted to hold the · premises, first, for the benefit of Raymond, and, then, for himself.

In its decree, the court recites that its findings of fact appear in its memorandum on the merits. Among them we find the following:

"On August 24th, 1942, Mr. MacFadden's services were terminated by the trustee after the notice provided for in the letter of employment dated February 13th had been given."

As the letter provided for a thirty-day notice, the notice, therefore, must have been given at least as early as July 25th. Nevertheless, MacFadden paid the August rental by Raymond's check as usual. But early in August and after MacFadden's employment had ceased, the coplaintiffs Raymond and The Old National Bank of Spokane, as administrator of the Rinehart estates, notified MacFadden that they would not recognize the option which the Rine-

harts had given MacFadden on February 13, 1942. Why this was done the record does not show. It may be that Raymond and the bank had some just reason for this action, but we can only judge from the record that is before us, and, so doing, we can only regard this as an outright breach by Raymond of his duty to MacFadden. For, as we have already seen, in order to induce the assignment to him by the Rineharts, he promised, in writing, to recognize MacFadden's option and to carry it out should it be exercised.

As preliminary to discussing the September lease, it is well to orient ourselves as to the legal position of the parties after MacFadden's employment entirely ceased on August 24th. Raymond had done nothing whatever to make himself liable on the March 5th lease. The lessors could not possibly have successfully enforced it against him. His whole attitude had been, as he admits, that he did not want to be liable on a lease. Neither, of course, could he have enforced it against the landlords. Under the state of facts above shown, MacFadden would have been estopped by his letter of March 10th from enforcing it against Raymond, and he would have had major difficulties in enforcing it against the lessors. Practically one-fourth of the two-year term of the lease had expired, and he had neither taken possession of the premises nor paid any rent. Now, he was no longer Raymond's agent, and Raymond had joined with the administrator in an attempt to cancel his option rights. It is difficult to see that there was any relation of trust and confidence between MacFadden and Raymond after August 24th. The relation of employer and employee had ceased, and whatever relation of trust and confidence there had carried over from the agency relationship had, by Raymond's act in repudiating MacFadden's option, been succeeded by an atmosphere of mutual hostility.

The trial court, in its memorandum, expressed the belief that the landlords, in giving each of the leases to Mac-Fadden, believed that they were leasing to Raymond. There are some rather loose and indefinite expressions in

the testimony of Schuler which tend to support the trial court's view, but we find nothing substantial in the record to the effect that MacFadden led the lessors to believe that they were leasing to Raymond. In fact, it seems to us that the record shows that MacFadden was rather frank and candid in his dealings with Schuler and Mrs. Inman. While Schuler, testifying as to the first lease, said that he knew that MacFadden was in charge of the business and believed that he could rely on anything he said, he further testified, in response to questions put by respondents' counsel, that MacFadden said, at their first meeting, that he had an option on the business, that the business had no lease, and that he wanted the protection of a lease. With reference to the conversation about the first lease, Schuler testified, in part, as follows:

"MR. GILBERT: Q. Now, let's get this straight, Mr. Schuler, because it is important. Do I understand that in the first conversation that Mr. MacFadden had with you that MacFadden told you that the bank or Raymond didn't want a lease? A. He says, 'The banks don't take leases.' Q. And he told you that in the first conversation? A. Yes, sir. Q. And you did understand, then, that he was asking you for a lease for his own individual benefit and in his own name? A. He said, 'Well, as long as the bank don't take it, I will take it myself.' Q. So you understood in the negotiations that the bank wasn't to have any interest in the lease? Is that right? A. That is the way I understood it."

Having in mind that Schuler used the words "bank" and "Raymond" interchangeably, there was no misrepresentation in this. That Raymond at no time wanted to become liable on the lease is an admitted and undisputed fact.

Mrs. Inman testified that she left practically everything in connection with the business to Mr. Schuler, and, with reference to the first lease, that, while, she was attending the cattle show, Schuler came out and asked her to come down to the bottling works to sign it. She testified, in part, as follows:

"Q. Did you pay any attention to who the lease ran to or who might be interested in it, whether the business or Mr.

MacFadden, or didn't you care? A. Well, I thought Mr. MacFadden said he was taking the lease. Q. He said he was taking the lease? A. Yes, sir. Q. He made that statement in your presence? A. Yes. Q. He didn't at any time in your presence say that he was taking it for the benefit of the creditors or the business as represented by Mr. Raymond? A. Mr. Raymond wasn't mentioned. Q. He said he was taking it for himself? Is that your recollection? A. Yes."

As to the second lease, Mr. Schuler testified that, when it was negotiated, he understood from MacFadden that he was on a vacation. The fact was that Mr. MacFadden had been discharged. It is, we suppose, largely upon this testimony that the trial court believed that Schuler thought MacFadden was acting for Raymond. But we are unable to come to the conclusion that Schuler so thought, in view of some other parts of his testimony, for instance, the following:

"Q. What did he tell you was the reason for taking a new lease? A. Well, he told me—he said, he said he had made a mistake by giving the bank's checks instead of his own, paying, and he said naturally it would show that he was paying it out of the trust company. Q. He said he had made a mistake? A. Well, he says he should have made out the checks himself, personal checks. Q. Now, is that the only reason he gave? A. Well, he said that he thought in order to protect himself for the lease that we should have a new lease made out. That is all he said."

Moreover, as to the second lease, Mrs. Inman testified, in part, as follows:

"Q. When was the first you knew about this second lease? A. When Mr. MacFadden and Mr. Schuler came out. Q. They drove clear out there? A. Yes, but I was coming down that night so I just came in the next day and signed that. Q. You signed it the next day? Did you hear Mr. MacFadden or Mr. Schuler in their talk give any reason why it was necessary to have a new lease? A. Well, he just said he made the company's checks for the rent instead of his own and the lease was his. Q. And that he had made a mistake in giving the checks that way, did he tell you? A. Well, I don't recall that. He might have. Q. In your own way, Mrs. Inman, tell the Court what was

your—what impression of the reason did you get as to why it was necessary to execute this new lease? MR. JOHNSON: I object to that as a conclusion. MR. GILBERT:   Q. What was said there in the conversation or by Mr. Schuler in Mr. MacFadden's presence as to why this new lease was necessary?   A. Well, he said he had an option on the building. He said it was his lease and he had an option to buy the business.   Q. This second lease we are talking about.   A. Yes.   Q. That he had made a mistake in paying the rent— A. I can't say that he said he made a mistake.   He said he should have paid the rent with his own checks instead of the company's checks."

There is no testimony in the record as to these matters contrary to the testimony above quoted.   The evidence given by Schuler and Mrs. Inman was in no way rebutted. We know of no reason why it is not entitled to faith and credit.   They had, it is true, been made defendants when the action was brought, which, technically, warrants the respondents in speaking of Schuler as an "adverse party," and the court, in its memorandum, in referring to him as "an adverse witness"; but, in reality, he had lost that character before he gave his evidence.   At the beginning of the trial and before any witnesses were called, counsel for Schuler and Inman announced that they would not defend, but, as the court phrases it in its memorandum, would "accept as lessees whichever party is determined by the Court to be the owner of the lease, . . ."

About September 4th, MacFadden asked Schuler to cancel the March 5th lease and give him a new lease for two years, beginning September 1st.   At first, Schuler did not wish to tie up the property for an additional six months, but yielded to MacFadden's persuasion that the soft drink business was essentially a summer business, and that this would give him, in effect, another business year.

After consultation with Mrs. Inman, the lease was formally canceled and a new lease given.   It is urged that this cancellation was unlawful because in derogation of Raymond's rights in the lease.   The court was evidently of the opinion that the cancellation was unlawful, for it treated the lease as existing by holding that, even if Ray-

mond did not adopt the lease at the time it was made, he did so at the time of bringing suit, which was after the purported cancellation. It also treated it as an existing lease in its decree.

It seems to us, however, that that lease was legally canceled. It was between Schuler and Inman as lessors and MacFadden as lessee, and they were the canceling parties. Raymond had known of its existence for about six months, but had assumed no liability upon it. In fact, he deprecated its very existence because he seems to have feared that he might in some way become bound by it. Substantially, a fourth of the term of the lease had expired and the lease had never become operative. Why should the parties to it not cancel it? To put it in a more direct way, what legal or equitable interest of Raymond was affected by its cancellation?

In our opinion, the real question presented for decision is whether or not MacFadden should be decreed to be a constructive trustee of the September lease for the benefit of Raymond. The March 5th lease was never operative and was canceled before this action was begun. We think, also, that it reasonably appears, from the foregoing recital of facts and evidence, that this case is not necessarily governed by cases where an employee surreptitiously goes out and leases the premises of his employer out from under him. Such conduct is so wholly disloyal to the principal that, when it is shown, equity invariably erects a constructive trust. In such a case, the formula expressed by Judge Cardozo, in pronouncing the opinion of the court of appeals of New York in *Beatty v. Guggenheim Exploration Co.*, 225 N. Y. 380, 386, 122 N. E. 378, 380, applies almost automatically:

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee."

But before equity will declare that one who has legally acquired a thing must hold it for the benefit of

another, the evidence that the defendant has breached a trust and confidence which that other had a right to repose in him must be clear and convincing, and the breach of such a nature as to shock the judicial conscience. It follows, of course, that each individual case is governed by its own facts.

To recapitulate, the facts appear to us to be, in substance, as follows: MacFadden had been negotiating for Rinehart Beverages for a considerable time before financial difficulties required an assignment to creditors. He had investigated the business thoroughly and knew, among other things, the expiration date of the lease. On February 13, 1942, instruments were drawn in which the Rineharts gave him an option on the business, subject to an assignment to creditors, and they assigned the business to Raymond, upon his promise to recognize that option if and when exercised. Thus, Raymond got an immediate interest in the business, and MacFadden, a contingent interest at the same time and from the same source.

Raymond employed MacFadden as manager. Here was something more than a mere principal and agent relation, as both parties knew MacFadden was an agent with an interest. MacFadden took charge, paid the February rental and the March rental with Raymond's check. Sometime late in February, however, he called Raymond's attention to the fact that he had only a month to month tenancy. Summer, the active season of the business, was approaching. In any event, the expense of moving the heavy machinery would be very great. He thought they should have a lease. Raymond would not take a lease. MacFadden proposed that he take a lease in his own name. Raymond objected to that. MacFadden took it, nevertheless. Raymond was displeased, but took no steps whatever to make the lease his own. MacFadden assured Raymond, in writing, that he would not use it in hostility to him, and he never did. On the contrary, he put the lease aside, claimed nothing under it, and paid the month to month rental with Raymond's checks, just as he would have done if the lease

had never been made, making one such payment after he had been given notice of discharge.

Had Raymond, during this period, adopted the lease and brought an action for a decree, declaring that MacFadden held it for his benefit, he probably would have prevailed, because MacFadden was then his employee and agent, and, while MacFadden did have an interest, it was contingent only, while Raymond's was immediate. But Raymond did not do so. He let things stand as they were. He had no liability on the lease, which was what he wanted. His month to month tenancy was being maintained. He had MacFadden's promise that the lease would not be used in hostility to that tenancy, and, then, too, it might come in useful if he was given notice to quit.

In late July, Raymond gave MacFadden notice of discharge, which he had a perfect right to do, a right which MacFadden does not, and has not, questioned. But early in August, and after the notice had severed the relation of principal and agent, he repudiated his agreement to recognize and carry out MacFadden's option. It would seem that, in equity and good conscience, no relation of trust and confidence survived that event. Whatever trust and confidence that would be carried over from the previous relationship of principal and agent was thoroughly liquidated by Raymond's declaration that he would not recognize or carry out MacFadden's option. After that, he could not reasonably claim that he was reposing trust and confidence in MacFadden. It seems to us that from that time on MacFadden owed Raymond no loyalty actually or constructively through having formerly been his agent, but that he was wholly free to look after his own interest.

It is argued that MacFadden should be held to hold the September lease in trust, because it is said that he used a lease which really belonged to Raymond to procure it. But it appears to us that the evidence shows that both Schuler and Mrs. Inman believed that they were leasing to MacFadden in both instances. It would seem, also, that the existence of the first lease actually made it more difficult for MacFadden to secure the second. As we read the

evidence, Schuler was at first reluctant to give him the second lease because he already had one.

It is strongly urged that MacFadden's haste in negotiating the second lease should count heavily against him. After convincing Schuler that he should have a new lease, he immediately drove Schuler some fifty miles to Mrs. Inman's country home to get her consent thereto. So strongly was MacFadden pressed by counsel on this point that he said, defensively, that one of the reasons he did so was that it was a nice day for a drive, and it is said that this is obviously a weak and puerile excuse for his conduct. But did he stand in need of an excuse? We can understand how a zealous advocate can sincerely feel that MacFadden's haste to acquire the lease has a sinister significance, but it seems to us that, to a neutral observer, MacFadden's conduct in this respect might well present no more than a typical picture of a man diligent in his own business.

It is also strongly urged that MacFadden's conduct in demanding an exorbitant rent from Raymond after he secured the September lease shows his bad faith in the whole transaction. But he may have quoted a high figure for the purpose of bargaining. Nor can we be wholly certain what his demands were. In its memorandum opinion, the court said:

"On the same date Mr. MacFadden sent a letter to Mr. Raymond, together with an assignment of the September rent, and notified him that arrangements must be made by September 8 for the amount of rent to be paid for the first floor of the building. *It was stipulated that a conference was held on the 8th, which was the day after Labor Day. The defendant MacFadden demanded $300 rental, which was refused.*" (Italics ours.)

But, in the statement of the facts which the court later certified, the stipulation which the court appears to have had in mind reads as follows:

"MR. JOHNSON [Counsel for MacFadden]: It is stipulated between counsel at this time that on September 8th Defendant MacFadden submitted through his counsel to Mr. Raymond's counsel an offer to continue the month to month

rental at *$200* per month, and that offer was not accepted by the plaintiff Raymond. (Italics ours.)

"MR. GILBERT [Counsel for Raymond]:: That is correct. In other words, we didn't accept it within the time that they said we must."

It is our opinion that, considering the record as a whole, it does not contain sufficient evidence to establish such a breach of trust and confidence on the part of the appellant as would warrant a court in erecting the constructive trust prayed for.

The decree is reversed, and the cause remanded for such further action in consonance with this opinion as the facts and circumstances may require.

SIMPSON, C. J., BLAKE, and MALLERY, JJ., concur.

MILLARD, J. (concurring)—The judgment should be reversed. The facts as recited in the foregoing opinion establish, as of September, 1942, relationship of Raymond as tenant of MacFadden, whose title as his landlord Raymond was thereafter estopped to deny; therefore, MacFadden is entitled on his cross-complaint to recovery of the premises involved herein and damages of six hundred dollars monthly from October 1, 1942, less monthly rental of two hundred dollars paid by Raymond to MacFadden's lessors under stipulation and order of the court. So understanding the foregoing opinion, I can concur therein.

October 26, 1944. Petition for rehearing denied.